## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**RONNIESHEIA HUGHES**      *      **CIVIL ACTION NO.**
     *
     *      **SECTION:**
**VERSUS**      *
     *      **JUDGE:**
     *
**CENTENE MANAGEMENT**      *
**CORPORATION &**      *
**LOUISIANA HEALTHCARE**      *
**CONNECTIONS, INC.**      *
     *

**************************************************************************

## COMPLAINT WITH JURY DEMAND

Plaintiff**,** Ronniesheia Hughes, ("Plaintiff" or "Ms. Hughes"), through undersigned counsel files this Complaint against Defendants, Louisiana Healthcare Connections, Inc., and Centene Management Company for violations under the Family Medical Leave Act ("FMLA"), the False Claims Act ("FCA"), the Louisiana Medical Systems Program Integrity Law and the Louisiana State Whistleblower Law as codified by LSA R.S. § 23:967 and avers as follows:

### INTRODUCTION

Ms. Hughes was a Manager of Compliance and State Reporting for Louisiana Healthcare Connections ("LHC") and Centene Management Company ("Centene") serving Medicaid participants in the State of Louisiana. In 2022, Ms. Hughes developed a serious health condition and was approved for FMLA leave from July 2, 2022 to October 1, 2022. While on FMLA leave, Centene and LHC repeatedly interfered with Ms. Hughes' rights. After her return, the retaliation began.

When Ms. Hughes became aware that the Vice President of Compliance was engaging in illegal activity, Ms. Hughes, a Certified Fraud Examiner, notified the LHC/Centene. Ms. Hughes escalated her concerns to Human Resource and Ethics and Compliance, ultimately resulting in Ms. Hughes termination.

## JURISDICTION AND VENUE

### 1.

This Court has original subject matter jurisdiction of this action pursuant to 28 U.S.C. §1331, because this action arises under the laws of the United States, and specifically, The Family and Medical Leave Act ("FMLA"), 29 U.S.C.A. § 2601, *et seq*. and the False Claims Act, 31 U.S.C. § 3730, (the "FCA.") This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 for the reason that the claims arising pursuant to state law arise out of the same claim and controversy that exists herein.

### 2.

Venue is proper in the United States District Court for the Middle District of Louisiana under 28 U.S.C. §1391(b) because LHC is domiciled in the Middle District of Louisiana, Centene is registered to do business in the Middle District of Louisiana, and a substantial part of the actions giving rise to Ms. Hughes' claims arise from the activity of Defendants' headquarters located in the Middle District of Louisiana.

## THE PARTIES

### 3.

Plaintiff, Ms. Ronniesheia Hughes, is an adult citizen and resident of Denham Springs in the State of Louisiana.

4.

Made Defendants:

A. Louisiana Healthcare Connections, Inc. (hereinafter, the "LHC.") LHC is a corporation registered in the State of Louisiana, with a registered business establishment in Baton Rouge, Louisiana.

B. Centene Management Company, LLC ("Centene"). Centene is a limited liability company, registered in and doing business in Baton Rouge, Louisiana. Centene is domiciled in the State of Wisconsin.

**COVERED EMPLOYER**

5.

Ms. Hughes' claims arise, in part, from the Family and Medical Leave Act. At all times, LHC and Centene had more than fifty employees within a seventy-five-mile radius and was a qualified employer under the FMLA. Ms. Hughes was a covered employee.

**FACTS**

6.

On information and belief, Centene is the parent company for LHC (together, "LHC/Centene.") LHC holds a contract with the State of Louisiana to administer Medicare and Medicaid services to the recipients in Louisiana.  LHC/Centene is a Managed Care Organization ("MCO.")

7.

As an MCO, LHC/Centene provides services to eligible Medicare and Medicaid recipients.

8.

Ms. Hughes holds a bachelor's degree in accounting and a master's degree in business administration. Ms. Hughes is a certified fraud examiner.

9.

Ms. Hughes began employment with Centene/LHC on January 08, 2018, to fulfil the newly created role of Manager of Compliance of State Reporting. This position was for the Medicaid division of the MCO.

10.

In her role as Manager of Compliance and State Reporting ("MCSR"), Ms. Hughes was charged with ensuring that LHC/Centene complied with the state Medicaid contract, as well as the state and federal regulations governing MCO's.

11.

As a member of the compliance department, Ms. Hughes worked to ensure /LHC/Centene met its state reporting obligations as required of MCO's pursuant to the Medicaid/Medicare regulations and integrity laws as well as the contract with the State of Louisiana.

12.

In order to be reimbursed as a MCO, LHC/Centene had to provide the State with reports and deliverables. These reports had specific timelines and requirements. If a report were for reimbursement, for example, the report had to follow a certification process. The number of reports required increased over the term of Ms. Hughes employment with LHC.

13.

Ms. Hughes would also translate information about the changes in the Medicaid plan to the Vice-President's of Centene/LHC's various departments for the state contract.

14.

On information and belief, while Ms. Hughes was employed at LHC/Centene, the Medicaid members using LHC grew from 100,000 members to over 500,000 members.

15.

In the spring or early summer of 2022, Noelle Collins was hired to replace Ms. Hughes' supervisor, Alesia Wilkins-Braxton, who had resigned in March, 2022.

16.

Ms. Collins was hired to be the Vice President of Compliance in June 2022.

17.

In or around 2022, Ms. Hughes was diagnosed with Major Depression Disorder and Generalized Anxiety Disorder. Ms. Hughes began to experience panic attacks and sought the treatment of a physician.

18.

In June 2022, Ms. Hughes was recommended for FMLA leave by her treating physician, while under his care and having treated on several occasions.

19.

After Ms. Collins was hired, Mr. Hughes voiced an initial concern that LHC/Centene was not complying with the state contract requirements by hiring Ms. Collins, a resident of another state. Ms. Collins ignored Ms. Hughes concerns, which exacerbated Ms. Hughes anxiety further.

20.

After filling out the necessary paperwork, Ms. Hughes was approved for FMLA leave from July 2, 2022 through October 1, 2022.

21.

On July 01, 2022, LHC/Centene began the process of placing Ms. Hughes on FMLA leave. LHC/Centene shut down Ms. Hughes computer access and employee activity status.

22.

In early August 2022, Ms. Hughes realized she had not been paid for all work completed by her in June prior to going out on FMLA leave.

23.

Ms. Hughes contacted Human Resources to inquire about her missing wages. To resolve this, Human Resources required that Ms. Hughes log into the company system as "active" to work on an HR "ticket." This would allow Ms. Hughes to collect her unpaid wages.

24.

On Monday, August 08, 2022, while Ms. Hughes was logged in to correct the June salary error, Ms. Hughes' supervisor, Ms. Collins learned that Ms. Hughes was in the system. Ms. Collins took this as an opportunity to assign Ms. Hughes work to complete while on FMLA leave.

25.

Ms. Collins instructed Ms. Hughes that she was responsible for doing the jobs assigned to her and that she must complete them within a week.

26.

During this interruption of her FMLA leave, Ms. Collins assigned Ms. Hughes duties including responding to emails, creating a training manual, training two new hires, and completing

40-50 reports that were due the following Monday. This interruption took place from August 08, 2022, until August 19, 2023 ("the period of interference.")

27.

MCO's are legally required to certify and attest to the accuracy of all state reports submitted to follow the state and federal regulations, as well as to be reimbursed under the Medicaid program.

28.

During the period of interference, Ms. Hughes learned that Ms. Collins had begun certifying and attesting to the accuracy of the state report deliverables. This amounted to false reporting as Ms. Collins was not the owner of the MCO. Ms. Hughes sent Ms. Collins the criteria for certifying and attesting to deliverables. Ms. Hughes notified Ms. Collins that her signing on behalf of the MCO was a violation of the certification requirements.

29.

During the period of interference, Ms. Hughes and Ms. Collins had a one-on-one meeting in August. During this meeting, Ms. Hughes verbally informed Ms. Collins that she was engaging in false reporting. Ms. Hughes told Ms. Collins that was a misappropriation of Medicaid funds and that she was falsifying documents.

30.

Ms. Hughes further informed Ms. Collins that the certifications were required to be a hand-signed signature, using blue ink.

31.

Ms. Collins became increasingly hostile towards Ms. Hughes during the period of interference.

32.

After the period of interference, Ms. Hughes returned to her authorized leave.

33.

As a result of the period of interference, Ms. Hughes feared for her job security, despite being on protected leave.  Further, Ms. Hughes had concerns about the false reporting.

34.

Ms. Hughes returned to work from FMLA leave on September 26, 2022, instead of October 1, 2022.

35.

Upon Ms. Hughes' arrival back at work, Ms. Collins began to retaliate against Ms. Hughes.

36.

On September 27, 2022, Ms. Hughes was on a team "huddle" meeting and Ms. Collins cut Ms. Hughes off from speaking and ignored Ms. Hughes' feedback.

37.

After Ms. Hughes return from FMLA leave, Ms. Collins immediately began demeaning Ms. Hughes in front of coworkers and giving Ms. Hughes an overall bad attitude.

38.

Shortly after her return from FMLA leave, Ms. Hughes identified that Ms. Collins was still falsifying reports despite Ms. Hughes informing Ms. Collins that this was "false reporting" in August, 2022.

39.

Ms. Hughes additionally told Ms. Collins that she could not attest to her own work and that she should not be attesting to anything on the state report deliverables certificate as the owner. Ms. Collins continued to do it anyway.

40.

In or around October 2022, Ms. Collins retaliated against Ms. Hughes. She directed Ms. Hughes to refrain from communicating with business owners, and not to communicate with the State, despite this being a necessary duty of her job position. This inability to communicate with the State made Ms. Hughes' compliance position substantially more difficult.

41.

Ms. Hughes then learned that Ms. Collins directly constructed compliance state reporting department employees to continue to use her electronic signature and to attest to her own work, certifying the accuracy of the state report deliverables.

42.

As a Certified Fraud Examiner, Ms. Hughes continued to tell Ms. Collins throughout the month of October that she needed to stop the false reporting.

43.

Specifically, in one conversation, Ms. Hughes told Ms. Collins that her attestation was certifying that there was no "misreporting" to the State. Mg. Hughes informed Ms. Collins that if there was information that Ms. Collins could not properly certify, the MCO would be required to report the missing information in the attestation certificate.

44.

In or around the fall of 2022, Ms. Hughes informed Ms. Collins that she was failing to abide by key staff regulations. Specifically, LHC/Centene was required to report to the state the residential status of key staff members. Ms. Collins ignored this component and attempted to hire out of state employees.

45.

In early November 2022, Ms. Hughes was called into a meeting with Ms. Collins. Ms. Collins placed Ms. Hughes on a Performance Improvement Plan or "PIP." Ms. Collins reprimanded Ms. Hughes for tasks she failed to complete assigned by Ms. Collins in August2022, during the period of interference.

46.

As a result of this retaliation, Ms. Hughes filed her first formal Human Resources grievance in November 2022. Ms. Hughes reported the interference and retaliation to Human Resources. Further, Ms. Hughes further internally reported Ms. Collins repeated and consistent failure to comply with the state reporting requirements of the Medicare/Medicaid regulations.

47.

On information and belief, after a review, Human Resources assigned a new supervisor to Ms. Hughes, Candace Campbell. Ms. Campbell directly reported to Ms. Collins.

48.

Ms. Collins refused to accept this and used Ms. Hughes' new supervisor, Ms. Campbell, as a third party to continue to retaliate against Ms. Hughes. As Ms. Collins sat above Ms. Campbell in the chain of command, Ms. Campbell's hands were tied.

49.

Ms. Collins would arrange for meetings with Ms. Collins, Ms. Hughes and Ms. Campbell. During these meetings, Ms. Collins would discipline or criticize Ms. Hughes.

50.

Ms. Campbell eventually stopped participating in these hostile meetings, leaving Ms. Hughes' effectively back under the supervision of Ms. Collins. Ms. Collins began to contact Ms. Hughes directly to retaliate against her even further.

51.

As Ms. Collins continued to act as Ms. Hughes direct report, Ms. Hughes continued to inform Ms. Collins of her false reporting.

52.

In or around the fall or winter of 2022, Ms. Hughes identified that there was inaccurate data and information related to a Report 221. A Report 221 is the Paid Claims Report and Deny Claims Report that was due monthly. This report allowed the MCO to be reimbursed by the government for timely paid claims. Ms. Hughes identified errors or incompleteness in the reports and notified Ms. Collins of same. Ms. Collins ignored Ms. Hughes and caused the reports to be attested to anyway.

53.

In or around the fall or winter of 2022, Ms. Hughes took issue with Ms. Collins failure to meet the timelines of the state contract. Ms. Hughes advised Ms. Collins that this would come with significant penalties to the MCO.  Ms. Collins ignored the timelines, causing LHC/Centene to incur the penalty fees anyway.

54.

Ms. Hughes informed Ms. Collins that she should not simply attest or certify information simply to meet a timeline and informed Ms. Collins about the measures in place to seek an extension for a report. Instead, Ms. Collins continued to not check the accuracy of the reports.

55.

On one occasion, in or around December, 2022, Ms. Hughes notified Ms. Collins that she submitted inaccurate data and information related to the submission of the "145 Fraud, Waste, and Abuse Report." This is a program integrity report.

56.

In the fall/winter of 2022, Ms. Hughes repeatedly informed Ms. Collins that she was failing to abide by the state and federal laws for timely submission. MCO deliverables had specific due dates. If a MCO does not submit it timely, a penalty will be assessed and given to the MCO.

57.

The law requires that MCOs must contact the state for an extension. The MCO would still have to submit a document stating that the information was incomplete. Ms. Collins would refuse to timely comply with the contract, which resulted in penalties to LHC/Centene. Ms. Hughes repeatedly advised Ms. Collins about the need to comply with the state regulations and contract.

58.

Ms. Hughes filed two more Human Resources complaints in or around November and December 2022.

59.

Simultaneously with Ms. Hughes informing Ms. Collins of the violations, Ms. Collins treatment of Ms. Hughes became worse.

60.

Ms. Hughes reported that Ms. Collins was now attempting to withhold Ms. Hughes' bonus and that the retaliation was continuing.

61.

From October 2022 until the date of her termination, Ms. Collins required that Ms. Hughes complete tasks that were impossible to achieve due to Ms. Hughes' being denied access to the state or executives.

62.

From October 2022 until the date of her termination, Ms. Collins required that Ms. Hughes work extra-long hours, sometimes from 7:00 a.m. until the middle of the night.

63.

On multiple occasions, Ms. Collins effectively changed the terms and conditions of Ms. Hughes employment.

64.

From October 2022 until the date of her termination, Ms. Collins repeatedly demeaned Ms. Hughes in front of her colleagues or third-party contractors.

65.

From October 2022 until the date of her termination, Ms. Hughes continued to bring errors in state reports to Ms. Collins attention. Ms. Collins seemed to not care about the false reporting.

66.

At the end of December, 2022, or early January, 2023, Ms. Hughes ultimately reported Ms. Collins' violations to the LHC/Centene Ethics and Compliance Department.

67.

Ms. Hughes participated in two brief meetings with the Ethics and Compliance Departments in January, 2023, and February, 2023. In these meetings, Ms. Hughes reported some of Ms. Collins' unethical and illegal actions and directives with a male employee (name unknown) from the Ethics and Compliance Department.

68.

Ms. Hughes informed the Ethics and Compliance Department that Ms. Collins was not abiding by the laws for CMO's as it relies on state reporting requirements and residency requirements of key staff personnel.

69.

Ms. Hughes began to gather information to support her evidence of Ms. Collins illegal activity.

70.

While Ms. Hughes was participating in interviews with the Ethics and Compliance Department, Ms. Collins' geared up to terminate Ms. Hughes.

71.

Ms. Collins continued to develop her false pretense that Ms. Hughes had performance problems.

72.

On information and belief, Ms. Collins made it seem as if the penalties received were the fault of Ms. Hughes.

73.

By February 2023, Ms. Collins had learned that Ms. Hughes had begun the initial reporting to start a company wide investigation into the false reporting.

74.

Ms. Hughes was on a corporate meeting phone conference on or around February 28, 2023. Ms. Collins ordered Ms. Hughes to exit the meeting, embarrassing her yet again in front of her colleagues.

75.

After forcing Ms. Hughes out of the work meeting, Ms. Collins unilaterally terminated Ms. Hughes – advising her that her termination would be effective March 01, 2023.

76.

Ms. Hughes was terminated with approximately five (5) pending retaliation complaints against Ms. Collins and shortly after Ms. Hughes reported Ms. Collins' activity to the Ethics and Compliance Department.

77.

Following her termination, the Ethics and Compliance Department stopped contacting Ms. Hughes for information related to her claims of misappropriation and false reporting.

78.

Following her termination, Ms. Hughes contacted Human Resources several times in March, 2023, inquiring about LHC's failure to pay money that she had earned.

79.

After her termination, the Ethics and Compliance Department stopped contacting Ms. Hughes to inquire about Ms. Hughes reports of LHC/Centene's violations of federal and statutory regulations for MCOs.

80.

Ms. Hughes filed a complaint with Human Resources at LHC/Centene about her paycheck and learned that Ms. Collins falsified Ms. Hughes tax withholdings.

81.

To date, Ms. Hughes has been unable to secure steady employment with comparable benefit programs to the employment she had with LHC/Centene prior to the violation of her federally protected FMLA rights.

82.

As a result of her termination, Ms. Hughes lost her wages and health/dental/vision insurance for her and her family.

83.

As a single mother to two children, Ms. Hughes was unable to afford insurance for her and her family.

84.

Ms. Hughes also lost her life insurance that protected her two children.

85.

As a result of Ms. Hughes unlawful termination, LHC/Centene marked Ms. Hughes as ineligible for rehire for one of the largest Medicare/Medicaid administrators in the State of Louisiana.

**CLAIMS FOR RELIEF**

86.

Ms. Hughes suffered economic damages, including the costs associated with loss of wages and the inability to immediately secure equivalent employment because of the termination and her need for medical leave. Further, Ms. Hughes suffered non-economic damages, which are ongoing.

87.

Ms. Hughes' termination was in violation of federal and state law, and has resulted in extensive damage to her, for which she is entitled to back pay, front pay, lost benefits, loss of value of benefit plans, loss of value of life insurance, compensation for emotional distress and anxiety, liquidated/punitive damages (where applicable), attorneys' fees, and such other legal and / or equitable relief to which she may be entitled as a matter of law.

**Count I—Violation of 29 U.S.C.A. § 2601, et seq.**
**The Family and Medical Leave Act ("FMLA")**
**FMLA Interference and Retaliation**

88.

Plaintiff reasserts each of the allegations set forth in this Complaint.

89.

Plaintiff suffered from a serious health condition, specifically, major depression, anxiety, and panic attacks, for which she was treated by a physician for the condition.

90.

After being afforded FMLA leave, Plaintiff's medical leave was interfered with in August and September, 2022. Plaintiff was required to perform extensive work duties in the middle of her leave, without being cleared by a medical provider.

91.

After her early return from FMLA leave, Plaintiff's supervisor retaliated against her for taking FMLA.

## COUNT II
## False Claims Act – Retaliation
## 31 U.S.C. § 3730(h)

92.

Plaintiff reasserts each of the allegations set forth in this Complaint.

93.

Plaintiff engaged in protected activity under the False Claims Act as more fully discussed herein.

94.

Plaintiff reported illegal activity relating to Defendants contract with the federal government to administer Medicaid/Medicare as a Care Management Organization.

95.

Plaintiff reported that Defendants were falsely certifying documents, such as state deliverables reports to the government, which were required for Defendants to be paid pursuant to the federal Medicaire/Medicaid contracts.

96.

Plaintiff's reporting created the distinct possibility of False Claims litigation.

97.

Plaintiff was discriminated, harassed, retaliated against, and ultimately terminated in her efforts to prevent False Claims Act violations.

98.

Plaintiff repeatedly complained that her supervisor and Defendants were violating the requirements of the state administered Medicare and Medicaid programs which she believes to be false reporting or Medicaid/Medicare fraud.

99.

Plaintiff believes that these violations resulted in false claims to the government, as Defendants were failing to properly meet its reporting requirements under the Medicare and Medicaid contracts.

100.

Plaintiff avers that she was retaliated against in violation of the retaliation provisions of the False Claims Act.

### **COUNT III**
### **Violation of Louisiana's Medical Systems Programs Integrity Law – Retaliation**
### **LSA R.S. § 49:439.1**

101.

Plaintiff reasserts each of the allegations as set forth in this Complaint.

102.

The Louisiana Medical Assistance Program Integrity Law prohibits retaliation of any employee that challenges false claims related to Medicaid/Medicare programs.

103.

Plaintiff avers that Defendants actions, as outlined in the facts and Count II of this Complaint, additionally amounts to a violation of the Louisiana Medical Systems Programs Integrity Law.  Specifically, the retaliation provisions thereof.

104.

Plaintiff reported that Defendants were falsely certifying documents, such as state deliverables reports to the government, which were required for Defendants to be paid pursuant to the federal Medicare/Medicaid contracts.

105.

On multiple occasions, Plaintiff informed her supervisor of these violations and ultimately reported the violations to human resources and the Ethics and Compliance Department.

106.

As a result of this report, Plaintiff was retaliated against and ultimately terminated as a direct result of her reporting non-compliance with the Medical Systems Programs Integrity Law.

**Count IV—Louisiana Whistleblower Statute**
**LSA R.S. 23:967**

107.

Plaintiff reasserts each of the allegations set forth in this Complaint.

108.

Plaintiff refused to participate in Ms. Collins' illegal activity and continuously reported the activity to Ms. Collins who ignored Ms. Hughes reports.

109.

Plaintiff avers that LHC/Centene, through Noelle Collins, violated state laws regarding reporting requirements for MCOs. Plaintiff avers that Ms. Collins was committing fraud.

110.

Specifically, LHC/Centene was violating the Medical Systems Program Integrity Laws, as well as the state statute for Medicaid fraud laws by establishing a workplace practice of submitting false, incorrect, or incomplete information in the state report deliverables required by MCOs.

111.

Ms. Hughes reported to Ms. Collins and to LHC/Centene that Ms. Collins was knowingly reporting false information on LHC/Centene's state reports required of MCOs for reimbursement. Ms. Hughes reported that she was falsifying Medicaid documents. This is a violation of LSA-R.S. 14:70.1.

112.

Ms. Hughes reported to Ms. Collins that it was illegal to present a false claim in order to obtain payment from the medical assistance programs. This is a violation of LSA-R.S. 46:438.3.

113.

Ultimately, Plaintiff reported violations of the law to Human Resources and the ethics/compliance departments of Defendants for Plaintiff's supervisors' failure to comply with state and federal regulations for state reporting of MCOs. Plaintiff intended to work with Ethics/Compliance to report this information to the proper regulatory authorities.

114.

Prior to participating in a full investigation, Ms. Collins manufactured reasons to terminate Ms. Hughes.

115.

As a result of her reports to Human Resources and Ethics/Compliance, Plaintiff was harassed and ultimately terminated.

## DAMAGES

Ms. Hughes' damages because of the actions of Defendants are extensive. Ms. Hughes' damages include but are not limited to:

A.  The loss of employment and employment benefits (medical and retirement);

B.  The loss of a Life Insurance policy to protect her two young children.

C.  The loss of future employment.

D.  Damages awarded by Statute.

E.  Emotional distress.

F.  Penalties awarded by Statute.

G.  Attorney fees awarded by Statute; and

H.  All other reasonable fees and costs that Ms. Hughes may be entitled.

## DEMAND FOR JURY TRIAL

Ms. Hughes requests that this matter proceed before a trial by jury.

## RELIEF REQUESTED

**WHEREFORE,** Plaintiff Ronniesheia Hughes requests judgment be entered against Defendant and that the Court grant the following:

a.  Plaintiff requests a trial by jury.

b.  Wherefore Plaintiff requests judgment be entered against Defendants and that the court grant the following:

  i.  Declaratory relief.

ii. Judgment against the Defendant for Plaintiff's asserted causes of action.

iii. Award of Compensatory damages.

iv. Award of special damages.

v. Award of punitive damages.

vi. Award of double back-pay as provided for by the False Claims Act.

vii. Award of costs and attorneys' fees as provided for by statute.

viii. Award of economic losses, including but not limited to back pay, and lost benefits, as established at trial.

ix. Pre- and post-judgment interest; and,

x. An order for such other and future relief, at law or equity, to which Ms. Hughes may be justly entitled.

**PLAINTIFF REQUESTS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

RESPECTFULLY SUBMITTED,

_____
**CHELSEA B. CUSIMANO**, La. Bar No.34857
**M. SUZANNE MONTERO,** La. Bar No. 21361
**KATHERINE B. WELLS,** La. Bar No. 36077
**HALEY JUPTIER,** La. Bar. No. 40416
Sternberg, Naccari & White, LLC
935 Gravier Street, Suite 2020
New Orleans, Louisiana 70112
Phone: (504) 324-2141
Fax: (504) 534-8961
cbc@snw.law | suzy@snw.law |
katherine@snw.law | haley@snw.law
Counsel for Complainant, Ronniesheia Hughes

**PLEASE SERVE:**

**CENTENE MANAGEMENT COMPANY**
THROUGH ITS REGISTERED AGENT OF SERVICE
CT CORPORATION SYSTEM
3867 PLAZA TOWER DRIVE
BATON ROUGE, LOUISIANA 70816

**LOUISIANA HEALTHCARE CONNECTIONS, INC.**
THROUGH ITS REGISTERED AGENT OF SERVICE
KEITH ARMSTRONG
C/O CHAFFE MCCALL, LLC
8550 UNITED PLAZA, SUITE 103
BATON ROUGE, LOUISIANA 70809